**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 30, 2009

No. 08-30422

Charles R. Fulbruge III
Clerk

Pioneer Exploration, Ltd.

Plaintiff-Appellee

v.

Cleveland J. Rutherford and Terry A. Rutherford

Defendants-Appellants

Appeal from the United States United States District Court for the Western
District of Louisiana
USDC No. 2:07-CV-566

Before GARWOOD, OWEN, and HAYNES, Circuit Judges.

PER CURIAM:[*]

This appeal arises from the execution of a surface land Lease Agreement
(the lease) between plaintiff-appellee, Pioneer Exploration Ltd. (Pioneer), and
defendants-appellants, Cleveland J. Rutherford and Terry A. Rutherford
(collectively, the Rutherfords). After entering into the lease, the Rutherfords
contested the "Premises Leased" provision of the contract. On March 26, 2007,
Pioneer filed a Complaint for a Declaratory Judgment in federal district court.
On October 2, 2007, the Rutherfords filed a counterclaim requesting reformation

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH
CIR. R. 47.5.4.

of the Lease Agreement. On April 11, 2008, the district court granted summary judgment in Pioneer's favor. The Rutherfords timely appealed to this court. For the following reasons, we AFFIRM.

## I. FACTS AND PROCEEDINGS BELOW

In the summer of 2005, a Pioneer representative, John Gilbert, approached the Rutherfords to discuss the possibility of leasing their property for the construction and operation of an oil and gas facility. The Rutherfords owned approximately twenty acres of land in Cameron Parish, Louisiana. The tract was divided approximately in half by a shell road, and though the portion north of the road was unused, the Rutherfords maintained their homesteads south of the road.[1]

During lease negotiations, the Rutherfords were represented by their attorney, Jennifer Jones (Ms. Jones), and Pioneer was represented by its vice president and general counsel, George Ruff (Mr. Ruff). Five drafts of the lease agreement were circulated prior to the final agreement. Each draft recited the following property description: "7 acres of land out of the SE/4 of the NE/4 of Section 34." But this property description was incorrect—the Rutherfords did not own any land in the northeast quarter of Section 34.[2] Thus, every draft prior to the final agreement contained a totally incorrect legal description of the property to be leased. Also, none of the prior drafts described which seven acres of the approximately twenty-acre tract were to be leased, and both parties admit that seven acres was an approximation and the exact amount of acreage to be

---

[1]While lease negotiations were ongoing, the Rutherfords' homesteads were destroyed by hurricane Rita; there is evidence that at all times, the Rutherfords have intended to rebuild their homes on the same site.

[2]The Rutherfords own land in the western half of the northeast quarter of the southeast quarter of Section 34 (abbreviated as W/2 NE/4 SE/4 of Section 34); they do not own any land in the northeast quarter of Section 34.

included in the lease was uncertain.

Pioneer rejected each draft containing the incorrect legal description and repeatedly requested "a better property description." In January 2006, Mr. Ruff sent Ms. Jones a letter requesting a "good description of the 7 acres." In response, Ms. Jones faxed Mr. Ruff two documents: (1) a copy of the Cameron Parish Assessor's Office's record containing the legal description of the Rutherfords' property and (2) an approximately letter size copy of a "Tobin" map covering more than 20 sections in the area, including section 34, on which she had highlighted a some seven acre area.[3] The fax cover sheet read: "See attached property description from the Cameron Parish Assessor's Office." This record reflected that the Rutherfords owned 21.95 acres in the "W/2 NE/4 SE/4 SEC 34."

After receiving these documents, Mr. Ruff inserted the property description into the lease as follows: "All of the land owned by Lessor in the W/2 NE/4 SE/4 of Section 34." This property description encompassed approximately twenty acres, though the parties repeatedly referred to the lease as seven acres in previous drafts and correspondence. The lease agreement, like all previous drafts, also states that the acreage is only an estimate, that Pioneer would arrange to have the property surveyed, and the survey description will replace the lease language property description.

Pioneer then sent the lease agreement to the Rutherfords and attached a cover sheet stating that Ms. Jones had supplied the lease's final property description. Pioneer also enclosed two checks for $5,000, each with the following notation: "SURF. LS. ACQUISITION COVERING, 7 ACRES IN THE

_____

[3]The highlighted portion of the map was extremely small and the map was sent via facsimile, rendering it difficult, if not impossible, to ascertain what portion of land was highlighted.

3

W/2NE/4SE/4 OF, SEC. 34, 14S, 7W CAMERON PARI[SH]." Though Mr. Ruff copied Ms. Jones on an email containing the cover sheet and final lease agreement, Ms. Jones alleges that she did not receive a copy of the lease agreement, either by email or mail. Three weeks later, the Rutherfords signed the lease agreement in Ms. Jones's office and Ms. Jones signed as a witness. Both the Rutherfords and Ms. Jones assert they did not read the final lease agreement prior to signing it.

Nearly ten months later, Ms. Jones contacted Mr. Ruff asserting that the property description contained in the final lease agreement was erroneous. She requested that the property description be changed to the following: "[a]pproximately seven (7) acres, more or less, located North of shell road in the West one-half (1/2) of the NE/4 of the SE/4 of Section 34." Pioneer responded that it did not wish to amend the lease, and Ms. Jones demanded renegotiation and threatened to sue Pioneer.

Pioneer responded by filing suit in federal district court for a declaratory judgment against the Rutherfords. The Rutherfords counterclaimed, alleging the contract was void due to (1) fraud, (2) unilateral error, and/or (3) mutual error, and requested rescission or reformation. The district court granted summary judgment in Pioneer's favor. The Rutherfords now appeal to this court. The parties agree that in this diversity case the applicable substantive law is that of Louisiana.

## II. DISCUSSION

The Rutherfords argue that the district court erred in granting Pioneer's summary judgment motion because the record evidence creates a genuine issue of fact as to the lease's validity. Under Louisiana law, consent is required to form a valid contract. LA. CIV. CODE ANN. art. 1927. "Consent may be vitiated by error, fraud, or duress," which consequently would invalidate the contract.

4

*Id.* art. 1948.[4]  The Rutherfords argue that, based upon the evidence presented, a reasonable trier of fact could determine that their consent to the lease was vitiated by (1) fraud, (2) unilateral error, or (3) mutual error; thus, Pioneer was not entitled to judgment as a matter of law.

This court reviews a district court's order granting summary judgment *de novo*, applying the same standard as the district court.  *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 478 (5th Cir. 2008).  Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  With respect to issues on which the nonmovant would bear the burden of proof at trial, "[a] genuine issue of material fact exists if the summary judgment evidence is such that a reasonable jury could return a verdict for the non-movant."  *Aryain*, 534 F.3d at 478.  "[A]ll facts and evidence must be taken in the light most favorable to the non-movant."  *LeMaire v. La. Dept. of Transp. and Dev.*, 480 F.3d 383, 387 (5th Cir. 2007).  In reviewing the evidence at summary judgment, we must "refrain from making credibility determinations or weighing the evidence."  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

We first address the Rutherfords' fraud and unilateral error claims before addressing the more difficult issue of mutual error.

## A. Fraud and Unilateral Error

Under Louisiana law, "[i]t is well settled that a party who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, that he did not understand it, or that the

---

[4]Parol evidence is admissible where a party argues "vice of consent," either through mistake or fraud.  *Condrey v. Suntrust Bank of Georgia*, 429 F.3d 556, 563 (5th Cir. 2005); *see also* LA. CIV. CODE ANN. art. 1848.

other party failed to explain it to him." *Aguillard v. Auction Mngt Corp.*, 908 So.2d 1, 17 (La. 2005). Bearing this principle in mind, Louisiana courts have consistently held that a unilateral error cannot invalidate an agreement if it was caused by a complaining party's "inexcusable ignorance, neglect, or want of care" or where that party "through education or experience, had the knowledge or expertise to easily rectify or discover the error complained of." *Scott v. Bank of Coushatta*, 512 So.2d 356, 362, 363 (La. 1987). This has become known as the contractual negligence defense and is most commonly used to bar rescission for errors "resulting from a party's failure to read the document in issue." *Ill. Cent. Gulf R. Co. v. R.R. Land, Inc.*, 988 F.2d 1397, 1405 (5th Cir. 1993). The defense also applies to fraud claims:

> "Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill. This exception does not apply when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations."

LA. CIV. CODE ANN. art. 1954. And again, this defense is consistently applied to bar a party's fraud claim where the complaining party failed to read a document before signing it. *E.g., Martin v. JKD Investments, LLC*, 961 So.2d 575, 578 (La. App. 2d Cir. 2007); *Sonnier v. Boudreaux*, 673 So.2d 713, 717–18 (La. App. 1st Cir. 1996).

The Rutherfords admit that neither they nor their attorney read the final lease agreement before signing it.[5] Had they read the document, they could have easily discovered the allegedly erroneous property description. The property description is contained in the "Premises Leased" provision, which is the first provision in the lease and is prominently located on the first page of the

---

[5]The Rutherfords also do not claim, nor is there any evidence to suggest, that a relationship of confidence existed between themselves and Pioneer.

agreement. It is set off by double indents, contains no more than twenty-five words, and begins with "[a]ll of the land owned by Lessor." Further, the Rutherfords were experienced in leasing their property, had qualified counsel at their disposal, and were in possession of the lease for three weeks before signing it. The lease was signed by them, and signed as a witness by their counsel (and acknowledged by them before a notary who was their counsel's secretary) all in their counsel's office. It was then sent to Pioneer for execution by Pioneer. Clearly the Rutherfords could have easily discovered the alleged error simply by reading the document; thus, the contractual negligence defense bars the Rutherfords' claims that their consent is void due to fraud or unilateral error.

Contractual negligence, however, "does not bar reformation where mutual mistake has been pleaded and proved." *Ill. Cent.*, 988 F.2d at 1398. Thus, we now turn to whether a fact question regarding mutual mistake exists.

### B. Mutual Error

The Rutherfords contend that there clearly existed an antecedent agreement between the parties that the leased premises pertained to a seven-acre tract of land located north of the shell road. Further, they argue that this agreement was incorrectly reduced to writing, that the error was mutual, that their consent was vitiated, and reformation is warranted.[6]

Again, Louisiana law requires consent to have an enforceable contract, and consent can be rendered void by error. LA. CIV. CODE ANN. art. 1927, 1948. In the event that an error causes a contract to recite terms to which neither party agreed, Louisiana law provides contract reformation as an equitable remedy.

---

[6]Pioneer argues that the Rutherfords are barred from raising this claim on appeal because they did not press the issue to the district court. This argument is without merit because the Rutherfords alleged mutual error in their Counterclaim and in their Memorandum in Opposition to Summary Judgment, and the district court definitively ruled on the issue.

*Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 274 (5th Cir. 1987). "Before an instrument will be reformed, 'there must be clear proof of the antecedent agreement as well as an error in committing it to writing.'" *Ill. Cent.*, 988 F.2d at1402 (quoting *Pat S. Todd Oil Co., Inc. v. Wall*, 581 So.2d 333, 336 (La. App. 3rd Cir. 1991)). Reformation is only available to "'correct mistakes or errors in the written instrument when such instrument, as written, does not express the true contract or agreement of the parties.'" *Phillips Oil*, 812 F.2d at 274 (quoting *Fontenot v. Lewis*, 215 So.2d 161, 163 (La. App. 3d Cir. 1968)). Most importantly, "[t]he error or mistake must be __mutual__,"[7] and the party seeking reformation must establish the mutual error by clear and convincing evidence. *Id*. (emphasis added).

In light of the summary judgment standard and the Rutherfords' burden of proof at trial, this Court must ascertain whether, viewing all of the evidence in the light most favorable to the Rutherfords, enough evidence exists for a reasonable factfinder to determine that the Rutherfords have shown mutual error by clear and convincing evidence. In making this determination, "the court should focus on who reduced the proposed agreement to writing, who the parties to the agreement were, whether the provision at issue was central to the agreement, and what pains the parties took in reviewing the written instrument." *Id*. at 275.

The evidence in the present case demonstrates that Pioneer intended to modify the final lease to include all of the Rutherfords' land. First, the "Premises Leased" provision is central to the lease agreement and was written

---

[7]The Rutherfords characterize the issue as whether the parties mutually intended to change the agreement at the last minute. This is a mischaracterization of the issue—there is no requirement of mutual intent, but rather a requirement of mutual error. It is quite possible the Rutherfords did not intend to lease all of their property, but that does not evidence that Pioneer did not intend to lease all of the Rutherfords' property.

in clear and unambiguous terms, beginning with "[a]ll of the land owned by Lessor." Second, Pioneer reduced the agreement to writing, and it is undisputed that Pioneer inserted the final property description. Mr. Ruff's affidavit explains that he inserted this property description after Ms. Jones faxed him the Cameron Parish Assessor's records showing that the Rutherfords owned nearly twenty-two acres in Section 34. The lease's final property description is not limited by any reference to seven acres or a shell road. The significance of the provision and Pioneer's affirmative act to include "all land owned," rather than a limiting provision, demonstrates that this language was not included by accident. Additionally, both parties were experienced in leasing—Pioneer is an oil and gas producer with experience in surface leases, and the Rutherfords had leased their own land before and were also represented by qualified counsel. All of these factors evidence that Pioneer was not mistaken when it agreed to lease all of the Rutherfords' land.

Still, the Rutherfords maintain that clear and convincing evidence exists that a mutual mistake was made. They argue that during the lease negotiations both parties consistently referred to the lease as seven acres, as evidenced by the prior lease drafts and Pioneer's own correspondences with Ms. Jones. Additionally, in their affidavits, the Rutherfords explain that they were only willing to lease the land north of the shell road because they maintained their homesteads in the southern portion of the tract.[8] These arguments do not convince us that the record contains clear and convincing evidence of mutual mistake.

---

[8]Again, the Rutherfords homesteads were destroyed by hurricane Rita during the negotiations. The Rutherfords maintain that they intended to rebuild their homesteads in the same location and never discussed the possibility of leasing the entire twenty-acre tract.

Though the parties consistently referred to seven acres, none of the previous drafts described land that the Rutherfords actually owned, nor did they mention a shell road or provide any means of identifying which seven acres of the twenty-acre tract were to be leased. It is also undisputed that seven acres was an approximation and neither party was certain as to the exact number of acres to be covered by the lease. When prompted to provide a more detailed property description, the Rutherfords' attorney instructed Pioneer to "see [the] attached property description from the Cameron Parish Assessor's Office," which showed that the Rutherfords owned 21.95 acres in the "W/2 NE/4 SE/4 SEC 34." Ms. Jones also faxed Pioneer a map highlighting an area within section 34, but the fax cover sheet did not direct Pioneer's attention to this map, and the highlighted portion is largely unidentifiable because it was sent via fax and comprises only a very small portion of the map.

The Rutherfords' strongest evidence of mutual mistake is Pioneer's enclosure of two $5,000 checks with a notation referencing a surface lease of "7 acres." However, these still do not provide clear and convincing proof that Pioneer included the language "all land owned" in error. It may be that the individual writing the checks believed the lease was for seven acres, but the lease itself clearly describes *all* of the land owned by the Rutherfords in a twenty-acre tract. And there is no indication that the individual writing these checks had any involvement with the lease negotiations, the drafting of the final property description, or was aware of what the parties ultimately agreed upon.

Last, the Rutherfords' reliance on this court's opinion in *Illinois Central*, which upheld a district court's reformation of a contract after finding that a party's inadvertent omission of a term constituted a mutual error and warranted reformation, is unpersuasive in the present context. *See* 988 F.2d at 1404–05. In *Illinois Central*, there existed strong evidence that the parties had previously

10

agreed to include a specific rider in the final sale. *Id.* at 1404. In fact, this very same rider had been included in a previous and related transaction between the parties. *Id.* at 1400, 1404. Yet, the drafting party inadvertently omitted the physical act of attaching the rider to the final agreement. *Id.* at 1404. And there was evidence that the other party was unaware of the rider's omission prior to signing because its actions were in accordance with the rider's terms. *Id.* at 1403 n. 17. Thus, the court determined that the physical omission of the rider was a mutual mistake, and reformed the agreement. *Id.* at 1404–05.

Unlike *Illinois Central*, the present case involves an intentional, affirmative act to include language in the most prominent provision of the contract. Pioneer did not inadvertently omit a term, it specifically altered a limiting phrase to extend the lease to "all of the land owned" in a twenty-acre tract. It is implausible that this could be done by accident or mistake. And, Pioneer, through Ruff, denied any such mistake. Every prior draft contained the language "7 acres," yet Pioneer consistently rejected this description, made repeated requests for a better property description, and ultimately revised the lease language to include "all of the land owned by Lessor."[9] This action reflects an affirmative, conscious choice by Pioneer rather than an inadvertent omission—a stark contrast to *Illinois Central*, where a specific rider, used by the parties in a related past transaction, was inadvertently failed to be physically attached to the final sale document.

Viewing the above evidence in the light most favorable to the Rutherfords, a reasonable factfinder could not find *mutual* mistake *by clear and convincing*

---

[9]As appellants assert in their brief to this court (p. 32) "it is hard to imagine how, *inter alia*, deleting 'seven acres' and inserting 'all of the land owned by Lessor' into the sixth draft of the lease was accidental." Similarly, appellants also assert in their brief that "a close review of the record exposes the real motive behind Pioneer's last minute deception of the Rutherfords." (*Id.* at 39).

*evidence.*

## CONCLUSION

For the aforementioned reasons, the district court did not err in granting summary judgment.

AFFIRMED.